(84 Misc. Rep. 534)

PEOPLE ex rel. WALCOTT v. PARKER et al., City Assessors.

(Supreme Court, Special Term, Tompkins County. March, 1914.)

1. TAXATION (§ 80*)—ESTATES SUBJECT TO—PROPERTY.

Where a charitable educational association built a building upon part of a university campus, itself exempt from taxation, without any written agreement, and no complete verbal agreement as to the terms and conditions of occupancy, but the university knew that it was built under the reasonable expectation that the association should have a lease at a nominal rent for a reasonable term of years and consented to a period of 20 years with the privilege of renewal for the same term, equity would prohibit the university from disappointing the association's reasonable expectation as to occupancy by expelling it from its ground and using the building for its own purposes, so that the tenure of the association for taxing purposes was that of a lessee at nominal rent for a reasonably long term, to be agreed on by the parties or fixed by the court.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 167, 168; Dec. Dig. § 80.*]

2. TAXATION (§ 251*)—EXEMPTION—BURDEN OF PROOF.

Taxation is the rule, and exemption the exception, and the burden of showing exemption rests on the one claiming it.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 343–345; Dec. Dig. § 251.*]

3. TAXATION (§ 242*)—EXEMPTION—CONSTRUCTION OF STATUTE.

The statute exempting charitable and educational institutions from taxation should be read in the light of the policy of the state, established early in its history and increasing in liberality as time has passed, to encourage education.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

4. TAXATION (§ 242*)—EXEMPTION—PERSONAL PROPERTY—USE.

Under Tax Law (Consol. Laws, c. 60) § 4, subd. 7, primarily exempting real property of associations, etc., used exclusively for educational or charitable purposes and also exempting the personal property of such as-

---

sociations, the object and use in the case of personal property must be the same as in the case of real property.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

5. TAXATION (§ 242*)—EXEMPTION—CHARITABLE AND EDUCATIONAL ASSOCIATION—INVESTMENT OF PROPERTY.

That an educational and charitable association, whose constitution provided that it should endeavor, not only to preserve, but to increase, the value of its property, and to that end might invest in and "conduct commercial enterprises," invested its endowment fund, on the income of which it depended to carry on its educational work, in the security of banking, transportation, and manufacturing companies, and that as a result of such investment it had the control of a power company, in view of Tax Law, § 4, subd. 7, exempting property from taxation only to the extent of the value of the part used for educational, etc., purposes, and of the provision relating to exemption and referring to an association organized or conducted for one or more of certain purposes, did not, for purposes of exemption from taxation, prevent the purposes of the association from being exclusively educational or charitable.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

6. TAXATION (§ 242*)—EXEMPTION—RESIDENCE.

A charitable and educational association, which had no principal place of business or office, and whose principal business was transacted at an annual convention held in different states, with associates residing in different states, with an association house in the state of New York necessarily subject to visitation and control by the state, had a residence for the purpose of taxation and exemption in this state and in every state where its work was carried on.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

7. TAXATION (§ 242*)—EXEMPTIONS—PROPERTY OF CHARITABLE AND EDUCATIONAL ASSOCIATIONS.

Tax Law (Consol. Laws, c. 60) § 3, makes all real and personal property in the state subject to taxation, unless exempted by law. Section 4, subd. 7, exempts the property of associations organized exclusively for charitable and educational purposes, when used exclusively for such purposes. An association, organized to give free education to young men by means of scholarships out of its endowment fund, erected a building on a university campus under an agreement by which it became a tenant at a nominal rent for a considerable term. The building was used as a home for the students, some of whom took courses at the university, giving them room, board, and tuition free, and furnishing courses in various subjects for their study. The students sometimes did outside work to supply themselves with money for things not furnished them. The association employed the necessary officers to manage it and the servants to care for the building, but received no income from any part of the building. Held, that the building was used exclusively for educational and charitable purposes, so that the association was not liable to be taxed on it or on its leasehold interest on the ground on which it stood.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

Action by Sidney S. Walcott, as president of the Telluride Association, against the County of Tompkins and Rodney G. Robinson, as County Treasurer, etc., to vacate and set aside an assessment on the property of the association in the city of Ithaca for the year 1910; and certiorari by the People of the State of New York, on the rela-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion of Sidney S. Walcott, as president of the association, against William H. Parker and others as assessors of the City of Ithaca, to review an assessment on the property of the association in the City of Ithaca for the year 1912—tried together. Referee's report confirmed on motion, and final judgment ordered for the association.

The following is the opinion of the referee (Irving G. Vann) mentioned in the opinion of Sewell, P. J.:

These cases present the question whether certain property of a voluntary association, composed of more than seven members and organized under the name of the Telluride Association, is exempt from taxation under the provisions of the Tax Law relating to exemption. That statute provides that "all real property within this state, and all personal property situated or owned within this state, is taxable unless exempt from taxation by law." Tax Law, § 3. The next section provides that certain property shall be exempt from taxation, and by its seventh subdivision that "the real property of a corporation or association organized exclusively for the moral or mental improvement of men or women, or for * * * charitable, benevolent, * * * educational, scientific, literary, library, etc. purposes * * * or for two or more such purposes, and used exclusively for carrying out thereupon one or more of such purposes, and the personal property of any such corporation shall be exempt from taxation. But no such corporation or association shall be entitled to any such exemption if any officer, member or employé thereof shall receive or may be lawfully entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes, or as proper beneficiaries of its strictly charitable purposes; or if the organization thereof for any such avowed purposes be a guise or pretense for directly or indirectly making any other pecuniary profit for such corporation or association, or for any of its members or employés, or if it be not in good faith organized or conducted exclusively for one or more of such purposes. * * * The real property of any such corporation not so used exclusively for carrying out thereupon one or more of such purposes but leased or otherwise used for other purposes, shall not be exempt, but if a portion only of any lot or building of any such corporation or association is used exclusively for carrying out thereupon one or more of such purposes of any such corporation or association, then such lot or building shall be so exempt only to the extent of the value of the portion so used, and the remaining or other portion, to the extent of the value of such remaining or other portion, shall be subject to taxation; * * * provided that the real property of any fraternal corporation, association or body created to build and maintain a building or buildings for its meeting or meetings of the general assembly of its members, or subordinate bodies of such fraternity and for the accommodation of other fraternal bodies or associations, the entire net income of which real property is exclusively applied or to be used to build, furnish and maintain an asylum or asylums, a home or homes, a school or schools, for the free education or relief of the members of such fraternity, or for the relief, support and care of worthy and indigent members of the fraternity, their wives, widows or orphans, shall be exempt from taxation. * * * "

The constitution of the Telluride Association was adopted in July, 1911, and the association has since worked under it, but prior to that date the Telluride Institute, its predecessor, carried on the same work, for the same purpose, along the same lines, and within the same limits as are provided by the instrument now in force. Indeed, the constitution was formulated a long time before it was formally adopted and had furnished in substance the rule of action for all practical purposes. It is quite long, and an analysis of its provisions is unnecessary, as it is sufficient to say that the association was organized to give a thorough education, free of cost, to young men of promise, capable of self-support as shown by actual experience; each being carefully selected by examination and vote after his application has been on file and he has been under observation for at least one year while pursuing a course

of study. When he thus becomes a member, all his ordinary expenses in getting an education, including board, lodging, tuition, etc., are defrayed by the association; but as soon as his education is completed he ceases automatically to be a member. The association is managed by an annual convention of the members and by officers and committees elected thereby. There are now about 125 members, some of whom are students at Cornell University and others in various institutions in five states in the West, and others still are not students but members through election by the convention that organized the association. No student pays the association in work, money, or otherwise for what he receives in the way of board, lodging, tuition, instruments, material, etc., needed in pursuing his studies in the university and in a building owned by the association known as Telluride House. The work of the association, both in Ithaca and elsewhere, is charitable and educational in character. It has no other work or duty in theory or practice. All members, except those who organized the association, are students; but a few students are not "members," although in practice the words "member" and "student" are used interchangeably. No student, member, or officer is paid anything or pays for anything, but certain persons employed as chancellor, dean, treasurer, and business manager, who are neither members nor students, and others employed as servants to care for rooms, provide meals, etc., are paid reasonable compensation for services actually rendered in furthering the educational work or taking care of the students, but for no other purpose. All the expenses of the building and of the students while occupying it are paid from the income derived from an endowment fund set up by charitable persons, now amounting to about $600,000, which is invested in corporate stocks and bonds and cared for by the officers, consisting of a president, vice president, and secretary, and by a committee of four elected for the purpose. The entire income is devoted exclusively to the education of the students and their maintenance while being educated, except a small percentage added each year to the endowment fund.

Telluride House was erected and paid for by the association between June, 1909, and September, 1911, and it is the taxation of that building, not as real estate, but as personal property in one case and a leasehold interest in the other, that gave rise to the present controversy. It is a substantial brick structure which cost about $95,000 and the furniture and equipment about $20,000 more. It has a dining room and kitchen on the first floor, living rooms on the second, sleeping rooms, and studies on the third and fourth. It has no laboratory or recitation rooms. The students live there, study there, eat and sleep there, and sometimes have social gatherings there with music and dancing. The association has no property in the city of Ithaca or the county of Tompkins except Telluride House and its equipment as above set forth. No part of said building is leased, or the source of any income. It is occupied exclusively by the members, students, and employés. No one receives any profit whatever, directly or indirectly, from the association, nor does any member, officer, employé, or outsider receive any pecuniary benefit except the amounts appropriated for scholarships to students and the compensation of employés for services actually rendered, reasonable in amount and fixed by the annual convention of the members.

Each student when admitted is given a scholarship which entitles him to maintenance, tuition, etc., but not to clothing or pocket money, although a small sum is allowed for general expenses. The students sometimes go out to work temporarily to supply themselves with such conveniences as are not furnished by the association and then return to their studies. The cost to the association every year for each scholarship is the sum of $1,000. Fifty per cent. of the students could not get a university education if the opportunity was not afforded by the association. There was at one time a working arrangement between the association and a corporation known as the Telluride Power Company of Colorado, under which certain applicants for membership were employed by that company upon the recommendation of the association for a limited number of hours daily, with compensation for work and opportunity for study. During the first year they worked more and studied less. The second, they worked eight hours a day, and the third six hours, and in both of those years had the rest of their time for study under an in-

structor employed by the company. The wages were precisely the same each year, and, though moderate in amount, were sufficient for support. In order to give the young men greater scope for improvement, the Telluride Association maintained a library and laboratories for their use. The object was to give them experience, to bring them into actual contact with business conducted along scientific lines, to test the men, weed out the less promising, and enable the association to make a safe choice of such as were regarded as worthy of scholarships. There was no arrangement or understanding, express or implied, that the students after graduation were to return to the company or work for it, although some of them did of their own volition. The association received nothing for the services rendered by them to the company and paid nothing for the opportunities for study afforded them by the company. There is the same working arrangement with a corporation known as the Beaver River Power Company, operating in Utah and Idaho, and efforts have been made to effect a similar connection with other companies. None of these companies has ever given anything to the endowment fund or to the association. Scholarships are not confined to those thus working for these companies, but are granted to others as well, but to none except those who are considered after careful test and observation to have the character, stamina, and fitness, as well as the preliminary attainments, to qualify them for admission as members or students in an institution having for its object the education of the most promising young men who can be found in the country. Some are selected from the body of students in Cornell University. Many have been rejected because they did not meet the exacting requirements, and the success, after graduation, of those thus chosen and educated has been gratifying. Graduates are now acting as professors and as managers, superintendents, and engineers of important enterprises. Scholarships are granted to the limit of the income, which has fallen off lately owing to current conditions, the average during the past few years being about 20 at the Cornell branch and 40 in all. About $20,000 a year is devoted to carrying on Telluride House and the maintenance of the students therein, and the rest of the income is expended for students in other institutions.

The education of the young men is not confined to the curriculum of the college they attend, and all the colleges accept the standards of the association for entrance to their courses without further examination on their part. The usual courses are mechanical, civil, and electric engineering, agriculture, science, art, and architecture. Music, law, and medicine are included, but there are few who take these courses. A scholarship in Telluride House involves residence in the building, so that the students can come in contact with noted educators and with men of distinction in literature, science, and art, who are systematically entertained there and occasionally lecture there. To illustrate, a director of the Smithsonian Institution visits the house frequently, talks to the students collectively, meets them in their rooms, takes great interest, and devotes much time to them. Other instances of like character were proved on the trial. This contact with broad and mature minds is regarded by the management as an important part of the education furnished. The association requires that all work taken at the university shall be kept up to a high standard, higher than the university itself requires. If a student fails to meet this requirement, he may forfeit his scholarship, even if in no danger of being dropped by the university, and there have been cases of forfeiture for this reason. The chancellor and dean, refined and cultivated men of high character and attainments, are in residence much of the time with the students in Telluride House, to watch them, advise and guide them, to teach them by precept and example, and to add to their education that which cannot be provided by the university itself. The dean is primarily in charge of the educational work and has a system of marking of his own, aside from the marks given by the university, which are furnished to him every month so that he can keep track of the students' progress. Public speaking is required once or twice a week, all the students take part, and a prize is given for excellence. To a moderate extent research work is entered upon, such, for instance, as the investigation of heat and the chemical composition of various oils. Each student in Telluride House is a student in the university also, taking one or more of its courses and sharing in its various privileges the same as

other students. Some of them belong to the college fraternities. The association awards its own diploma to each student who graduates from Telluride House, but not until a year has elapsed after his graduation from the university.

In 1910 an assessment was spread upon the assessment roll of the city of Ithaca for state and county taxes in the following form: Under the printed head of "Name," was written "Nunn, L. L., and Telluride Company"; under the printed head of "Personal," was written "$30,000"; under the head of "Total," was written "$30,000"; and under the head of "Taxes," was written "$75."

In 1912 an assessment was spread upon the assessment roll of the city of Ithaca in the following form: Under the printed head of "Personal Property. Name of person or corporation in tax district taxable on personal property," there was written "Telluride Association"; under the head of "Leasehold Interest," was written "$30,000"; and under the head of "Remarks," was written "Campus." No entry was made under any other head, nor was there any other writing on the roll for either of said years. The taxes amount to about $750 a year, except that in one year, when a large school building was erected in Ithaca, they were $1,500. L. L. Nunn, whose name appeared in the earlier assessment, had never been a resident of Tompkins county or of the state of New York, but he had been connected with the Telluride Association as a charter member. There never was a corporation in this state known as "Telluride Company," but there was one known as the "Telluride Power Company" in the state of Colorado, which carried on the business of constructing and operating hydro-electric plants in Colorado, Utah, and Idaho, but never in the state of New York. Since August, 1912, it has been in process of dissolution, and it never had any interest in Telluride House, the Telluride Association, or any of its property.

[1] The land upon which Telluride House stands is part of the campus of Cornell University in the city of Ithaca and for years has been and still is exempt from taxation under the statute. There is no written agreement between the university and the association, and no complete verbal agreement, specifying the terms and conditions of occupancy. The university consented that the building should be erected on the spot where it stands and knew that it was so erected under the reasonable expectation on the part of the association that it should have a lease at a nominal rent for a reasonably long term of years. During the interviews upon the subject of a lease held between the representatives of the two institutions, both before and since the erection of Telluride House, the association asked for a lease resembling those given by the university to fraternal societies building upon its campus, for a term of 50 years at a nominal rent with the privilege of 50 years more on the same terms, subject to forfeiture for violation of any condition specified; the building to belong to the university upon the expiration of the second period. The university, however, objected to the length of term, both original and renewal, and insisted upon a period of 20 years for each and upon final expiration the building to become its own property. At no time has there been a refusal to lease for a reasonably long period at a nominal rent.

Under these circumstances, equity will prohibit the university from disappointing the reasonable expectation of the association, based on its own action, by expelling the latter from its ground and using the building for its own purposes. Since equity treats as done that which ought to be done, the nature of the tenure or occupancy of the association is that of a tenant at a nominal rent for a reasonably long term to be agreed upon by the parties or fixed by the courts. This, I think, is the status of the property so far as the question of taxation is concerned, independent of the question of exemption. No disturbing question has yet arisen between the university and the association. Their relations are most cordial and harmonious and there is no reason to apprehend that they will ever be disturbed.

Whether either of the assessments as laid is sufficient in substance and form to satisfy the law, I do not decide, but, finding the facts as they exist, leave the conclusion of law in that respect to be found by the courts of review, in case they do not agree with me on the question of exemption.

[2-4] While taxation is the rule, and exemption the exception, and the burden of showing exemption rests on the one claiming it, the statute regulating the subject should be read in the light of the policy of the state of New York, established early in its history and increasing in liberality as time has passed, to encourage education. The state expends much money each year for this purpose, and, in further promotion of its broad policy, exempts from taxation the property of such associations, corporate or voluntary, as are organized exclusively for, among others, educational or charitable purposes, and used exclusively for one or more of those purposes. Tax Law, § 4, subd. 7. This provision applies primarily to real estate, but the same sentence provides that the personal property shall also be exempt, and the context and connection indicate that the object and use in the case of personal property must be the same as in the case of real estate. Otherwise the latitude of exemption would run far beyond the obvious intention of the Legislature.

[5] The question is raised whether the purposes for which Telluride Association was organized are educational or charitable to the exclusion of all others. The defendants read from the constitution, under the head of "Administration of Property," the following section: "It shall be the endeavor of the association not only to preserve the value of its property but to increase the same. To this end, and for the purpose of providing its members employment and experience, it shall be the aim of the association to establish, invest in and conduct commercial enterprises." Founded on the last three words of the provision quoted, the argument is made that carrying on a commercial enterprise cannot fall within the language of the statute, and hence that the object of the organization is not exclusively educational, or charitable.

As the association had an endowment fund and depended on the income therefrom to carry on all its work, it had a right to invest the fund, as it did in fact, in the stocks and bonds of various corporations, such as banking, transportation, and manufacturing companies. Investment in the stock of such a corporation is to a certain extent conducting the business thereof through the right of the stockholder to vote for directors. In this sense, clearly, the power to conduct commercial enterprises does not deprive the Telluride Association of the right to exemption so far as Telluride House and its contents are concerned. The association has never conducted a commercial enterprise in any way except by mere investment in its stock. It has never organized or originated any commercial enterprise. No such project has ever been proposed or contemplated.

It is true that the association owns a little less than one-half the stock of the Beaver River Power Company, and its friends own enough more to give control of the management through the combined voting power. This, however, is simply a result of the power to invest in corporate stocks, which cannot be questioned or held to carry the purpose of the organization outside of the statute. Is a university deprived of its right to exemption because it invests part of its educational funds in the stock of railroad, electrical, or manufacturing corporations and to this extent conducts commercial enterprises? Educational work cannot be carried on without money, and, unless an educational institution uses up its principal or lets it lie idle, it must invest in something and may, as most of them do, invest in corporate stocks. This does not deprive them of their right to exemption.

According to the uncontradicted testimony of a prominent member of the convention which adopted the constitution, the discussion indicated that the words "invest in and conduct commercial enterprises" were understood to mean simply the power to invest in stocks and bonds. Whether the association, for the declared purpose "of providing its members employment and experience," could originate, own, and carry on a commercial enterprise, it is unnecessary to decide, for no such thing has been done and none such has ever been contemplated, and the practical construction by the association of its own powers under its constitution is of value in ascertaining its meaning. It may be added that the statute itself contemplates a diverse use of a lot or building. There is exemption to the extent of the value of the portion used according to the statute, while the remainder is not exempt. This seems to indicate an intention to cut down the command that the association must be organized ex-

clusively for a statutory purpose, as otherwise the statute would indirectly sanction a use ultra vires. Moreover, the provision relating to exemption speaks in one place of a corporation or association "organized or conducted for one or more" of the purposes named. This also seems to indicate an intention to relax said command by extending exemption to such associations as are conducted exclusively for one or more of the statutory purposes, regardless of whether they were organized exclusively for such purposes.

[6] The constitution which constitutes the articles of association was adopted at a convention held in Utah, but each annual convention fixes the place of meeting for the next, and the conventions are held in different states. The association has no headquarters, principal place of business, or office. Its principal business is transacted at the annual convention. The associates reside in many different states, its president and more of its members in New York than in any other. Telluride House is necessarily from its situation subject to visitation and control by the state of New York. I am of the opinion that the association has a residence for the purpose of taxation and exemption·in every state where its charitable and educational work is carried on.

The association is so peculiar in purpose and practice as to be difficult of classification, and for this reason probably there is no decision by the courts that is strictly analogous. The chief reliance of the respondents is People ex rel. Delta Kappa Epsilon Society of Hamilton College v. Lawler, 74 App. Div. 553, 97 N. Y. Supp. 840, affirmed without opinion, two of the judges not acting, in 179 N. Y. 535, 71 N. E. 1136. In that case a building and the land upon which it stood were owned by a college Greek letter fraternity, organized, according to its constitution, for literary purposes and the promotion of the fine arts. The building was used primarily as a boarding house for the active members of the chapter, where they enjoyed the privileges of home life and met for social recreation and fellowship, but it was used incidentally for literary, educational and scientific purposes. In holding that it was not exempt from taxation, the court said: "The important and controlling question for our determination relates to the use to which the relator's property was put. * * * It is apparent that the partial or occasional use of the relator's chapter house for literary, educational, or scientific purposes is not sufficient to sustain its claim to exemption, unless it can be said that such purposes are primary and inherent, while all others are secondary and incidental; for although we ought not, perhaps, to give to the word 'exclusively' an interpretation so literal as to prevent an occasional use of the relator's property for some purpose other than one or more of those specified, yet the policy of the law is to construe statutes exempting property from taxation somewhat rigidly, and not to promote such exemption to be established by doubtful implication. * * * While it may be said that the relator is connected with Hamilton College, and that its chapter house is in a certain sense an adjunct thereto, yet so far as ownership, occupation and control are concerned it is entirely independent of the college. Its primary purpose is to afford the members of the fraternity owning it with an abiding place while attending college. It is there that they eat and sleep; it is there that they mingle with each other in social intercourse; it is there that they entertain their friends, and to that end in-· dulge in dancing and other similar amusements. In short, it is to all intents and purposes a club house, a place for rest, recreation, and fraternal intercourse, rather than for the purposes for which it is claimed to have been organized, which purposes are plainly secondary and incidental; and, such being the case, we do not see how, within the settled policy of the law, * * * it is entitled to exemption from taxation."

It is to be observed that in the case cited the educational element was not prominent and the charitable feature was wanting. The young men paid the expenses of carrying on the building and for their own maintenance, such as board, lodging, etc., while they occupied it. They paid their own tuition and their own way in every respect. They paid for every benefit received and for every privilege enjoyed. A use is not charitable when it is paid for wholly by one's self. On the other hand, in the case of the Telluride Association the young men paid for nothing connected with their education, which was free in every respect. They paid nothing for tuition, board, lodging, maintenance, or

anything connected with their education. The use and purpose of the association and of Telluride House is charitable and educational combined; charitable because all the expenses of the students are paid by the association, and educational because a thorough education is furnished, broader and more complete than that provided by the university. Charity and education together cover every purpose and every activity.

In the case of People ex rel. Young Men's Association for Mutual Improvement v. Sayles, 32 App. Div. 197, 53 N. Y. Supp. 67, it was held that a corporation organized exclusively for the purpose of promoting benevolent and charitable purposes, which owned Harmanus Bleecker Hall in the city of Albany, was not exempt from taxation as to the part of said hall that was leased for theatrical performances and public entertainments, because it was not used, in the language of the statute, "exclusively for carrying out thereupon one or more of such purposes, but leased or otherwise used for other purposes." It was held, however, that it was exempt as to the portion not so used. The same was held in the next case in the same volume, where a benevolent corporation owned a large public hall and leased it for hire to others for exhibitions, etc. People ex rel. Catholic Union of the City of Albany v. Sayles, 32 App. Div. 203, 53 N. Y. Supp. 65. The distinction between those cases and that under consideration is obvious without comment.

On the other hand, the plaintiff and relator relies on People ex rel. Board of Trustees of Mt. Pleasant Academy v. Mezger, 98 App. Div. 237, 90 N. Y. Supp. 488, affirmed without opinion in 181 N. Y. 511, 73 N. E. 1130. In that case the trustees of an incorporated academy with many buildings, including a stable, an armory with drill rooms, a library, and a building occupied by the principal as a residence, leased them all to the principal for $3,000 a year in excess of the cost of maintenance, but the excess was used by the trustees in improving the buildings and grounds. It was held that all the property was used exclusively for educational purposes and was exempt from taxation. The court said: "The assessors contend that all of the real and personal property of the relator is not used exclusively for educational purposes within the purview of this statute. It is insisted that 'sleeping rooms and drill rooms, armories and stables, library buildings and buildings occupied by the lessee as a residence, recreation grounds and dining halls,' although a part of the academy foundation and used in the administration thereof, are not within the exemption contemplated by the statute. The academy is both a day and a boarding school; consequently dormitories are necessary for the boarding pupils. The pupils are required to wear military uniform and are under military discipline. It is appropriate, then, that there should be an armory and a drill room. No particulars are given touching the stable. But it seems natural that a horse or horses should be required, and therefore must be kept, in the maintenance of a large boarding school. A library building is germane, if not essential, to the equipment of an academy. 'The lessee' is the head of the school, who lives in four rooms in one of the academy buildings; in other words, the principal is in residence. If the boarding pupils must dine, a dining hall is the proper place to serve them with victuals.   *   *   *   The statute should be applied so as to exempt the entire articulated system of an institution, and not merely the rooms or parts of buildings where tasks are conned or lessons are recited. The criterion is whether the property is exclusively devoted to the use of the academy in the education which the institution offers to those attendant upon it in the sense that education contemplates their mental, moral, and physical training, and their proper maintenance while upon the rolls."

While this case is not analogous, it is useful as tending to show the view of the court as to what is meant by an exclusively educational use of property. Many other authorities are cited, some from outside of the state, but they are not now of value, owing to the lack of analogy in their facts and in some cases to difference in the language of the statutes involved.

The novelty of the facts makes the case under consideration interesting, but so difficult as to invite divergent views, and the decision must rest on original impressions and reasoning rather than authority. My conclusion is that the facts stated, about which there is no dispute, and the reasons already . given, show that Telluride Association was organized exclusively, and that

Telluride House is used exclusively, for charitable and educational purposes. The statute is complied with when all of purpose or use that is not educational is charitable.

There should be judgment for the plaintiff in the action and for the relator in the special proceeding.

Simon Fleischmann and William R. Pooley, both of Buffalo, for relator.

Peter F. McAllister, of Ithaca, for respondents.

SEWELL, P. J. This is a motion to confirm the report of the Hon. Irving G. Vann, former judge of the Court of Appeals of this state who was appointed referee in the above-entitled certiorari proceedings instituted to review an assessment levied on the property of the relator, the Telluride Association, located in the city of Ithaca. The principal question presented for determination in this proceeding is of general interest and far-reaching importance. The assessors of Ithaca in the assessment roll before the court assessed the property of the Telluride Association, which a few years ago erected a fine building on the campus of Cornell University with the consent of the university authorities, and the association claims that it is organized exclusively for educational and philanthropic purposes and that the property in question is used solely for such purposes, which contention was sharply litigated before Judge Vann, who was appointed referee to report to the court his findings of fact, conclusions of law, and opinion upon the question presented. Judge Vann, in addition to formulating findings of fact and conclusions of law, also wrote a highly instructive and illuminating opinion on the question before him, all of which are now submitted to the court for its final action. I have examined these findings and the opinion in which Judge Vann recommends that a final order be made in favor of the Telluride Association, and there is nothing to add to what Judge Vann has so clearly and forcibly expressed in his opinion, which is adopted as that of this court and, in accordance with the recommendations of which, a final order in favor of the relator is directed to be entered. A copy of Judge Vann's opinion so approved by the court and made that of the court is hereto attached and made part of this memorandum.